O. B. HART,

Associate Justice Supreme Court.

IN THE MATTER OF THE EXECUTIVE COMMUNICATION OF THE 6TH OF FEBRUARY, A. D. 1871.

Article V, Sec. 16, of the Constitution of the State of Florida provides that "the Legislature shall have power to provide for issuing State bonds, bearing interest, for securing the debt of the State, and for the erection of State buildings, support of State institutions, and perfecting public works." *Held*, That the term "public works" refers to the incomplete system of internal improvements authorized by an act to encourage a liberal system of internal improvements, approved January 6, 1855. The internal improvements designated by this act, as proper subjects of State aid, and which were not perfected or completed at the time of the adoption of the Constitution of 1868, are the public works to perfect which the Constitution empowers the Legislature to issue bonds.

*To the Honorable E. M. Randall, Chief Justice of the Supreme Court of the State of Florida:*

SIR:—By Section 16, Article 5, of the Constitution, I may require the opinion of the Justices of the Supreme Court upon any point of law:

Under this constitutional provision, I have the honor to ask the opinion of the Supreme Court upon the following points of law.

First. Section 7, Article 12, of the Constitution of the State of Florida reads: "The Legislature shall have power

to provide for issuing State bonds, bearing interest, for securing the debt of the State, and for the erection of State buildings, support of State institutions, and perfecting public works."

Second. The Legislature, at the third General Session, passed laws to aid certain railroad corporations, declaring them to be public works, and expressing their intention "to aid in perfecting one of the public works embraced in the internal improvements of the State." (See 3d Session, Laws 1870, pages 10, 50 and 54.)

Third. Has the Legislature power to declare what are "public works?" Are railroads "public works" referred to by the constitution, and has the Legislature power under our constitution to aid in the construction and completion of these public works?

> HARRISON REED,
> Governor of Florida.

Tallahassee, Feb. 6, 1871.

---

SUPREME COURT OF FLORIDA, }
*Tallahassee, Florida,* Feb. 11, 1871. }

His Excellency HARRISON REED,
*Governor of Florida, Tallahassee:*

SIR:—Hon. E. M. Randall, Chief Justice of the Supreme Court of Florida, has forwarded to me from Jacksonville a copy of your communication of the 6th, addressed to him, in which you require the opinion of the Justices of the Supreme Court as to the interpretation of Section 7, Article 12, of the Constitution of this State. This section is as follows: "The Legislature shall have power to provide for issuing State bonds, bearing interest, for securing the debt, and for the erection of State buildings, support of State institutions, and perfecting public works."

Your questions are asked with reference to the provisions of an act entitled an act to perfect the public works of this

State, approved June 24, 1869, and, if I understand them, may be reduced to one question; that is, whether railroads, and what railroads, are included in the term "public works," as used in the section quoted above?

The question here to be answered differs very materially from the question which arises under acts of the Legislature passed under a constitution where there is no express inhibition authorizing townships, counties, or cities to pledge their credit or impose taxes to assist in the construction of railroads. So also does it differ to some extent from the questions which would arise under an act of the Legislature where the constitution did not expressly prohibit it imposing taxes for the construction of a railroad to be the property of the State. In the cases just mentioned, the act of the Legislature must be sustained, if at all, by virtue of the general power of the Legislature of a State to determine what are proper objects to be aided by the expenditure of public money, which acts of the Legislature are generally admitted to be constitutional, and within the powers of the legislative department of the government, if the end to be accomplished is public as contra-distinguished from private— is a public purpose rather than a private one. In this connection, and before entering into a discussion of the general subject, it is not inappropriate, in order to a thorough understanding of this question, to inquire why it is that the Legislature cannot exercise the power of taxation, or which is the same thing in principle, pledge the credit of the State for a strictly private purpose or use? It is not because of the doctrine that private property cannot be *taken* except for public use, for a taking within the meaning of this, an elementary principle of a republican government, is a taking altogether—an entire change of ownership. 6 Whar., 46; 1 W. & S., 225; 6 ib., 116; 1 Barr., 312; 1 Pick., 418; 7 ib., 344; 9 Harr., 166. Besides, if the imposition of a tax is such a taking, then the result is that there can be no taxation without compensation, and that would involve a repay-

ment to the party of the same amount, and the State would realize nothing. The reason is because such action would amount to a decree of confiscation, not to go to the government but to some private person. A law giving the property of A to B for a private end, or taxation for a strictly private purpose, would be an exercise of a power not legislative. It would be the exercise of judicial power, a judicial judgment by which the property of one man would be transferred to another, the Legislature undertaking to determine that the party to receive was entitled to it as against the party having it, without reference to any public benefit or use.

In the matter now before us, it is not necessary that I should express any opinion as to the general powers of the legislative department of the government. We are not to determine whether the judiciary, in the absence of constitutional restrictions upon legislative power, can create restrictions upon that power, upon the ground that the provisions of an act are inconsistent with the spirit of our institutions, or it impairs some of those rights which it is the object of free government to protect. Such a question as is claimed is presented when the Legislature authorizes a city to tax its citizens to construct a railroad not running within its corporate limits and owned principally by individuals.

It becomes my duty here to define an express grant of power by the constitution to ascertain its true meaning, and particularly to determine what is the meaning of the words "perfecting public works" in the connection in which they stand, and whether they embrace railroads. While it is apparent, therefore, that there is a great difference between this question and the questions involved in a case where the Legislature under its general powers has authorized the people of a county or city to tax its inhabitants to aid in constructing a railroad, yet it cannot be denied that great aid may be derived in determining the meaning of the word "public," as used in this express grant of power, from the

signification and meaning given to that word by courts where the Legislature under its general powers has undertaken to authorize taxation for certain works, such as the construction of a railroad. I have found no case in which a court goes so far as to hold that where there is no constitutional inhibition, the Legislature could not resort to taxation or to a pledge of the credit of the State to secure the construction and operation of a railway owned by the State and affording facilities of transportation to the people of the State. On the contrary, persons at all familiar with the early history of the leading commercial States of the Union, will remember that it was deemed true policy that the States should supply facilities to the public by railway, canal and otherwise; such was the practice of New York, Pennsylvavia, Virginia, and other States. Where the road is owned by the State there can be no doubt that a railroad would be a public work, as it would not be liable to the usual objection that it was owned by individuals, and that private parties realized all its gains and suffered its losses. Where, however, the railway is owned by individuals, some, I think three, of the courts, in cases where the Legislature has authorized the people of a county or city to subscribe for stock, have held that to justify taxation the purpose must be a public one, and that such works are not public in the sense which justifies a resort to taxation for their construction by municipalities or counties, but that they are private enterprises operated for private benefit, and that it is not within the power of the Legislature to authorize a levy of taxes by a county or town to construct railroads owned by private parties.

In the State of Michigan it has been held that they are not public in the sense which authorizes taxation, and the power to take private property for their use is justified as a proper "police power," by which the abstract right of a person to use and control his property is made to yield to the "superior interest of the public, under the guise of a conve-

nient fiction which treats a corporation managing its own property for its own profit as merely a public convenience and agency." According to the prevailing doctrine upon this subject, a corporation exercised the power of taking private property by virtue of what the courts deem strictly an exercise of the power of eminent domain, and that involves the idea that the taking is for *public use.* If such power can be properly granted to a corporation, this is no doubt the true doctrine upon which to base it. It is the generally accepted theory, and in my judgment, the correct one. There is no necessity to resort to "*a convenient* fiction" to declare that " a public convenience and agency" which is in fact so. If there is such a peculiar power and " convenient fiction" as makes a railroad a public convenience and agency to take the property of the citizen against his will, why cannot the same peculiar power and convenient fiction be called into existence and make it a public use or purpose so as to justify the imposition of a tax which simply imposes a burden? While I think three of the Supreme Courts of the States agree in this conclusion announced by Judge Cooley, the adjudications of sixteen States of the Union pronounce such acts of the Legislature constitutional. The Circuit Courts of the United States have, without hesitation, made a like decision, and the Supreme Court of the United States, in referring to these adjudications, has approved them in the strongest language, remarking that many of the opinions are marked by the profoundest legal ability and are sustained by reason and authority.

I do not deem it inappropriate in this connection to refer to the language of some of the courts in discussing this subject. The Supreme Court of New York remarks that " internal improvements may be constructed by general taxation, and in case of local works by local taxation, or the State may aid in their construction by becoming a stockholder in private corporations, or authorize municipal corporations to become such stockholders for that purpose.

Railways are public works, and may be constructed by the State or by corporations." The Supreme Court of Michigan draws a distinction between public works and private enterprises having a " public aspect." Chief Justice Cooley, for the court, uses this language : " I have said that railways are often spoken of as a species of public highways. They are such in the sense that they accommodate the public travel, and that they are regulated by laws, with a view to preclude partiality in their accommodations. But their resemblance to the highways which belong to the public, which the people make and keep in repair, and which are opened to the whole public to be used at will, and with such means of locomotion as trade or pleasure or convenience may dictate, is rather fanciful than otherwise, and has been made prominent, perhaps, rather from the necessity of resorting to the right of eminent domain for their establishment than for any other reason. They are not, when in private hands, the people's highways, but they are private property whose owners make it their business to transport persons and merchandise in their own carriages, over their own land, for such pecuniary compensation as may be stipulated. These owners carry on for their own benefit a business which has indeed a public aspect, inasmuch as it accommodates a public want, and its establishment is consequently in a certain sense a public purpose. But it is not such a purpose in any other or different sense than would be the opening of a hotel, the establishment of a line of stages, or the putting in operation of a grist mill, each of which may, under proper circumstances, be regarded as a local necessity, in which the public may take an interest beyond what they would feel in other objects for which the right to impose taxation would be unquestionable."

These objections were urged in the Pennsylvania cases, (21 Penn. State, 166, 187 ;) and Chief Justice Black there states the views of that court in the following language : " It has been argued, and here perhaps is the strain of the

case, that this will be taxation for a private purpose because the money levied will be in effect handed over to a private corporation. I have conceded that a law authorizing taxation for any other than public purposes is void, and it cannot be denied that a railroad company is a private corporation. But the right to tax depends on the ultimate use, purpose, and object for which the fund is raised, and not on the nature or character of the person or corporation whose intermediate agency is to be used in applying it. A tax for a private purpose is unconstitutional, though it pass through the hands of public officers, and the people may be taxed for a public work, although it be under the direction of an individual or private corporation. The question, then, is whether the building of a railroad is a public or a private affair. If it be public, it makes no difference that the corporation which has it in charge is private. A railroad is a public highway for the public benefit, and the right of a corporation to exact a uniform, reasonable stipulated toll from those who pass over it does not make its main use a private one. The public has an interest in such a road when it belongs to a corporation, as clearly as they would have if it were free, or as if the tolls were payable to the State. It is a grave error to suppose that the duty of a State stops with the establishment of those institutions which are necessary to the existence of government, such as those for the administration of justice, the preservation of the peace, and the protection of the country from foreign enemies. To aid, encourage, and stimulate commerce, domestic and foreign, is the duty of the sovereign as plain and as universally recognized as any other. It was a commercial restriction which caused the revolution. Canals, bridges, and roads, and other artificial means of passage and transportation from one part of the country to the other, have been made by the sovereign power and at the public expense in every civilized State of ancient and modern times. It being the duty of the State to make such public improvements, if she happen

to be unable or unwilling to perform it herself to the full extent desired, she may accept the voluntary assistance of an individual or a number of individuals associated together as a corporation. If the making of a railroad is a public duty which the State may do entirely at the public expense, or cause to be done entirely by a private corporation, it follows that such a work may be made partly by a State and partly by a corporation, and the people may be taxed for a share of it as rightfully as for the whole." Just here it may be remarked that if the terms "public works" embrace railroads, and the State should issue bonds to them, there is nothing in the present Constitution which prohibits the State from becoming a stockholder, and thus making herself an owner to the extent of her interest. And this is the difference between the present Constitution and the Constitution of 1839. Under the latter, any aid to a corporation, having in charge such work, must have been a gratuity; under the former, the State may become a stockholder and owner to the extent of the aid extended; and should it happen that the Legislature should make it a gratuity now, that fact would not affect the constitutional power in the premises if it exists. That fact would go to determine whether the discretion exercised was sound, and in accordance with a proper legislative policy. It could go no further.

To return, however, to the general question. It seems to me that the comparisons of the Supreme Court of Michigan are not entirely apposite. There are essential differences between stage coaches and the other things mentioned, and railways. A railroad is a permanent thing connected with the soil, and under certain circumstances it has assigned to it by law a public character. We cannot say that it has not this character by the law because the law has failed to give the same character to something else different from it in some essential respects.

Mr. Chief Justice Redfield of the Supreme Court of Vermont, who has given great attention to that branch of the

law which pertains to railways, says: " The decisions in the
several States seem all to have been in favor of the power of
the Legislature to build railways at the public expense, of
which there is, perhaps, no great question, for it seems to be
a species of internal improvement, which is in a measure in-
dispensable to public interests and public functions in many
ways."

I have thus given, I think, a fair and correct statement of
the action of the courts in reference to this subject, and the
cases quoted from are as strong representations of the re-
spective sides of this question as can be found.

If we look to the history of the general government at the
time when the subject of internal improvements by the'gen-
eral government was a matter of consideration and extended
debate, we can find no sanction for the view that a railroad
which may be in part or in whole owned by individuals, is
not a public work. In the early history of the republic, a
difference in the views of the legislative and executive de-
partments of the general government, in respect to its pow-
ers in the matter of internal improvements, is shown by Mr.
Madison's veto of the act to set apart a fund for internal
improvements, Mr. Monroe's veto of the act to repair the
Cumberland road, and Gen. Jackson's veto of the act au-
thorizing a subscription of stock in the Maysville Turnpike
Company. These vetoes were based principally upon the
ground that there was no such power granted to the general
government as authorized these acts; there was no such
power among the enumerated powers, nor was it a power
incident to any specifically granted power. It was, however,
conceded by many that an exercise of this power for purpo-
ses of general national, not local or State benefit, would be
proper, and such measures as granted aid to railroads owned
by individuals have repeatedly received the sanction of Con-
gress. An examination of the debates in Congress during
the year 1824, the period at which this question excited most
interest and commentary, as well as the views expressed by

the framers of the Federal Constitution, will show great dif-
ference in the views of eminent statesmen as to the constitu-
tional power of Congress in this respect, but we can find no
such general objection urged by individual members of Con-
gress as that a railroad could not be a public work in con-
templation of law because it was the property of an incorpo-
rated company.   If Congress had been granted an express
power to pledge the credit of the general government to
construct "public works," I do not think any student of its
history would long doubt that there would have been una-
nimity in the conclusion that some railroads, certainly those
of a national character in point of locality, were public
works.

On account of a difference claimed to exist between the
powers of Congress and those of a State Legislature, it being
said that one possessed only such powers as were specifically
granted or were necessary for the exercise of those granted,
and the other possessed all legislative power not prohibited
or restrained by the constitution, these particular constitu-
tional objections urged in Congress were not urged in the
States where there were no restrictions in this respect upon
legislative power ; on the contrary, it was admitted generally
that internal improvements within the States, such as rail-
roads, canals, &c., were legitimate subjects for State aid
when there was no constitutional inhibition.   I do not think
any one at all familiar with the public history of this coun-
try will be found to say that if we look to this history we
must not conclude that a railroad may be a public work, al-
though principally owned by individuals.   Congress author-
ized subscriptions of stock to the Chesapeake and Ohio
Canal company.   Other like measures have received its
sanction, and a railroad now stretches across the continent,
the   construction  of  which  was   greatly  aided  by  its
bounty.   Every State in the Union has aided them in one
way or another as public works.   In the great commercial
State of Pennsylvania there are over ninety laws enacted

upon the basis that they were public works, and in the State of New York this practice of regarding them public works commenced with the origin of railraoads and extends to the present time.

If we leave the United States and go to the history of Europe on this subject, we find that like works are regarded as public by all commercial nations. The history of France under the first Napoleon is amply suggestive of this. Indeed this was one solace of the Emperor when confined in St. Helena, for when speaking of his treatment by the allies, he says, " at least they cannot take from me hereafter the great public works which I have executed, the roads which I have made." I do not as a matter of course refer to this language as authority, but only as showing the accepted popular signification of the word public in this connection.

Accepted writers upon the law of nations, in speaking of the duties of governments in this respect, use very expressive language. Vattel says, (Book 1, chap. 9,) in speaking of the duty of governments in the matter of public ways of communication, that " one of the principal things that ought to employ the attention of the government with respect to the welfare of the public in general and trade in particular, must, then, relate to the highways, canals, &c. The whole nation ought to contribute to such useful undertakings." We find no sanction in these sources for the theory of the Michigan court, that, because a railway is in part owned by individuals, it is not a public work, and that taxation for that purpose was for a private purpose. This idea, when subjected to the test of close analysis, will not stand. That the instrument by which a thing is accomplished is to determine the character of the thing when accomplished, is not a truth either in philosophy or law. It is certainly a very narrow foundation for a judicial decision which pronounces unconstitutional an act of the Legislature upon the subject of taxation which is ordinarily a proper subject for legislative action, for it is neither an executive nor judicial discretion which

is exercised in determining either the subjects of taxation or the ends and objects of the expenditure of public money.

With this statement of the conclusions of the courts of the several States of the Union in reference to this subject, as as well as the history and practice of the legislative departments of the government, State and Federal, and the standing given to roads by accepted writers upon international law, we can more intelligently define and construe our own constitutional provisions on the subject, and with this preface I now address myself to that question.

The clause is as follows: " The Legislature shall have power to provide for issuing State bonds, bearing interest, for securing the debt, and for the erection of State buildings, support of State institutions, and perfecting public works." Upon the face of this clause it is seen that the term " public works " is used in contra-distinction to State buildings and State institutions. If this is not so, and a " public work" within the meaning of this clause of the constitution is the same thing as a " State institution " or " building," then the term public works is surplusage, is unnecessary. This court held in (12 Fla., 205,) a former case involving the construction of a clause of the constitution, that such a construction of a clause in the constitution as made one portion of it surplusage, is not to be given if the clause in question is capable of receiving another intelligent and consistent construction. The term " State buildings " has a certain and fixed meaning. The term " State institutions " has a more enlarged signification, indicating in a limited and strict sense such institutions as the State establishes to discharge its duty in the matter of the administration of the criminal laws, such as State prisons, as well as such as it establishes to discharge its duty to the unfortunates of society, such as the indigent, insane, the deaf and dumb, the blind, and others in like condition. The terms *"perfecting* public works," in my opinion, clearly indicate and mean that works of a public character *already commenced* are to be perfected.

They indicate something inchoate, something begun but not "perfected," and which should be "perfected" or finished. The inquiry at once presents itself, were there any such works of this character and in this condition when the present constitution was framed? It is unnecessary to cite authority to show that a clause of this character in a constitution, framed under the circumstances that our present constitution received its existence, must be interpreted in the light of the then present condition of things, as well as with reference to the past legislative and judicial history of the State in this respect. In the light of the past history of the State in these respects, and guided by the action of the legislative and judicial departments of the government, we inquire what unperfected public works are here referred to? At once we say that these words cannot and do not refer to any work owned exclusively by the State, for there were none such either commenced or perfected. There was no such thing as a State institution in its strict sense existing in the State to which these terms could be held to apply.

The first constitution of this State, the constitution of 1839, was framed by a body of men of distinguished ability; by men who knew what were the proper functions and the legitimate powers of a State in the complex system of government obtaining in this country; by men who understood as well the State's proper relations to the general government as they did its duties to its own citizens. Believing, as they no doubt did, that it was the peculiar if not the exclusive province of the State to aid in the construction of internal improvements, the benefits of which would be confined principally to State limits, and that it was proper to invest the legislative department of the government with the discretion of determining what were proper objects of State bounty, and believing that it was the true policy of the State to supply facilities to the traveling public, they adopted the following clause covering that subject: "A liberal system of internal improvements being essential to the

development of the resources of the country, shall be encouraged by the government of this State; and it shall be the duty of the General Assembly, as soon as practicable, to ascertain by law proper objects of improvement in relation to roads, canals, and navigable streams, and to provide for a suitable application of such funds as may be appropriated for such improvements." This body having the best reasons (derived from many sources, but particularly from the history of the territory of Florida,) for prohibiting the issue of State bonds, or pledging the faith of the State for any purpose of this kind, inserted another clause in that constitution which provided that " the General Assembly shall not pledge the faith and credit of the State to raise funds in aid of any corporation whatsoever." The effect of this constitution was therefore to acknowledge this duty, and while providing ample power for its discharge, it established such a check as would save the State credit and prevent that financial ruin which generally follows an unlimited power in the Legislature to pledge the credit of the State for such purposes. It could aid by an " application of funds appropriated," but it could not pledge the faith or credit of the State to raise such funds. In 1845, Congress appropriated for the purpose of internal improvements in this State five hundred thousand acres of land. Notwithstanding this mandate of the organic law, the language being " a liberal system of internal improvements *shall be encouraged;*" and notwithstanding this bounty by Congress, and notwithstanding the fact that Florida nearly equaled in square miles of territory the States of New York, New Jersey and Connecticut, making such improvements a great necessity, no established line of railway affording any considerable facilities to the people of the State was constructed for years. A system of improvements of this character, after being for years the subject of consideration upon the part of those whose duty it was to devise a system, was provided for by an act of the

46

Legislature of this State approved January 6, 1855, entitled " An act to provide for and encourage a liberal system of Internal Improvements in this State." The five hundred thousand acres of land granted for that purpose by Congress, as well as millions of acres of what is known as swamp lands, were constituted a fund for the purpose of internal improvements, and the Legislature designated certain lines of railway and canal as proper improvements to be aided from this fund. Quite a number of cases have been adjudicated in this Court, in which the companies entrusted by the State to construct the lines of railway indicated have been parties, and the courts in speaking of these contemplated improvements have styled them " *great public enterprises,*" as " enterprises in which the public have interests." This Court in 1862 said that " it could not forget that the community have rights in reference to these improvements, and that the happiness and well-being of every citizen depends on their preservation." Mr. Justice Walker of this Court, in 1862, speaks of this act as one " inaugurating a great constitutional *system,* a system which has enabled the State of Florida, the weakest in population among her sisters, to build more railroad in the same length of time than any other State in the world."

At the time of the adoption of the present constitution this system of public improvements had advanced greatly. There were a number of lines of road in operation, but there was a considerable and very important portion unfinished. The highest interest of the State required its completion. With this system incomplete, the capital of the State was reached with difficulty by citizens residing south and west, and many of the people in the western portion of the State were anxious for the want of these facilities, combined with other reasons, to become a portion of the State of Alabama.

In my opinion, these incompleted lines of railway and the internal improvements contemplated in the system created by the act referred to, were the unperfected " public works"

which the Constitution of 1868 contemplated should be perfected.

It may be said that the power to pledge the credit of the State is a very dangerous power to be vested in the Legislature, and that it should never be exercised unless the State has the most adequate security for the construction of the works. This is true, but there is no more power in the judicial department of the government to control a legislative discretion than there is in the legislative department to direct and control a judicial tribunal in pronouncing judgment in any action pending before it. If this dangerous power has been conferred, or it is being used and exercised without adequate security, we cannot for that reason say it has not been conferred, but the law must receive the same construction it would when the power is exercised in the most careful and judicious manner. For us to deny the power would be to assume that we were superior to the Constitution. If we can do this in one particular, we can do it in all respects, and that would make the very existence of the government a subject of judicial discretion.

I cannot close this communication better than by quoting the language of Chief Justice Black, of the Supreme Court of Pennsylvania, who felt constrained to sustain an act of the Legislature authorizing a resort to taxation for the purpose of constructing a railway. "If the power exists, it will continue to be exerted, and generally it will be used under the influence of those who are personally interested and who do not see or care for the ultimate injury it may bring upon the people at large. The selfish passion is intensified by the prospect of immediate gain; private speculation becomes ardent, energetic and daring, while public spirit, cold and timid at the best, grows feebler still when the danger is remote. Under these circumstances it is easy to see where this ultra enterprising spirit will end. But all these considerations are entitled to no influence here. We are to deal with it strictly as a judicial question." The conclusion I have

reached in this matter I regret.  I believe the power to pledge the faith and credit of a State or Nation should not exist except for purposes of national defence in time of war. It is a poor government that cannot sustain itself by legitimate taxation, and in the light of past history we can truly say that it is best that the powers of the government should be thus limited, or if public enterprises are to be aided, that such aid should be in the form of a cash appropriation, thus preventing burdensome and oftentimes repudiated indebtedness.  All of these things, however, would not justify me in stating a conclusion as to a matter of law which my conscience did not approve.

Very respectfully,

JAS. D. WESTCOTT, Jr.,<br>Associate Justice Supreme Court.

Opinion of Justice HART in reply to the letter of the Governor, dated February 6, 1871.

SUPREME COURT, STATE OF FLORIDA, }<br>Tallahassee, Feb. 15, 1871. }

In response to the inquiries of his Excellency Harrison Reed, Governor of the State of Florida, in a communication to the Honorable E. M. Randall, Chief Justice of the Supreme Court, dated the 6th inst., referring to Section 16 of Article V, and Section 7 of Article XII, of the State Constitution, and to the statute of 1870, providing for State aid to certain railroad corporations, and asking the opinion of the Supreme Court as to whether the Legislature has power to declare what are public works, whether railroads are public works referred to by the Constitution, and whether the Legislature has power under our Constitution to aid in the construction and completion of them, I have the honor to present the following opinion :

When it is remembered that the Constitution of the State

specifically provides for the building of court-houses and jails; the establishment, support, and maintenance of educational institutions; institutions for the benefit of the insane, blind, deaf, and such other benevolent institutions as the public good may require; a State prison; house of refuge for juvenile offenders; a home and work house for common vagrants; and provides for those of the inhabitants who, by reason of age, infirmity, or misfortune, may have claims upon the aid and humanity of society; and for State buildings; almost every kind of institution and ordinary structure that State Constitutions generally provide for, no person acquainted with the legislation of this State in 1854–'55–'56, in regard to railroads, with the decisions of its Supreme Court upon that legislation, with the condition of Florida in regard to its great need of them, with the fact that they are still unfinished, and also with the fact that the land grants by Congress in aid of them, as to the unfinished parts, had lapsed, and, from the events of the rebellion and civil war, were not likely, for at least some years, to be renewed, can for a moment fail to recognize the object of the use of the words, "*and for perfecting public works*" in Section 7 of Article XII of the Constitution. As one who was a member of the Convention that framed the Constitution, and as one of the people who voted for its ratification, I cannot unlearn or ignore the certainty that those words had special reference to our great unfinished railroad system, so necessary to the settlement, development, and prosperity of Florida, and so convenient, useful, and beneficial to the whole public.

Viewed in the light of the legislative and judicial history of this State upon this subject, and of the public facts above mentioned, the aforesaid words, " and perfecting public works," are as potent to authorize legislative enactments declaring railroads public works, and providing for raising means to aid in having them perfected, and especially such as the system inaugurated by the statute, approved January 6, 1855, commonly known as "*the internal improvement*

*law,*" as if those works were more definitely and particularly mentioned.

Constitutional provisions and grants of authority are not expected to be as explicit as statutory enactments. From their very nature something must be left to the intelligence, sound judgment, patriotism, discretion, and progressive enterprise of the legislators. Many of the men who were members of the aforesaid Constitutional Convention were afterwards members of the Legislature that enacted the said statute of 1870. Men of integrity and ability, and sworn to support the Constition, they certainly knew what the aforesaid words meant, and what the powers of the Legislature were under them.

Every presumption is in favor of the constitutionality of an act of the Legislature, and it should not be pronounced unconstitutional unless it is so plainly so as that such a conclusion cannot be reasonably avoided.

The wisdom and policy of the statute is not the question for the court. With that matter the justices have nothing whatever to do. The legislators are responsible to their constituents, and the judges to conscience and the law.

The people of the State have, in the Constitution, vested the legislative power of the State in the Legislature. That comprehensive grant of power is, in my opinion, itself amply sufficient to cover all the ground, and to authorize the Legislature to do any legislative act not prohibited by the same Constitution, nor by the Constitution of the United States ; to enact any statute which in its judgment the public weal requires ; to do what ever the State can do in the way of legislation. I presume it will not be doubted that statutes declaring what are public works, and providing for the completion of them, are acts of legislation, and form a part of the legislative power of the State.

The statute of 1870 referred to, treats of the same subject-matter with the aforesaid internal improvement law, and provides for aid to perfect most of the same lines of railroad

and others of the same and other public works.   Both provide for State aid ; one indirect, the other direct.   One, setting aside State property, and authorizing it to be pledged ; the other providing for pledging the credit of the State upon mortgage liens in lieu of the said credit.

Upon a careful consideration of the subject, I am of the opinion that the said act of 1870 is constitutional, and that the inquiries of his Excellency the Governor should be answered in the affirmative.

Very respectfully,

O. B. HART,

Associate Justice Supreme Court.

Opinion of E. M. RANDALL, C. J., in reply to the letter of the Governor, dated February 6, 1871.

TALLAHASSEE, FLA., <i>Feb.</i> 25, 1871.

To his Excellency HARRISON REED, <i>Governor :</i>

SIR :—Your official communication of the 6th instant would have received an earlier reply but for the fact that at the time it was received I was much engaged in other official duties which required early attention.

Your questions, suggested by recent legislation under the 7th Section of Article XII of the Constitution, which provides that the Legislature may " provide for issuing State bonds bearing interest for securing the debt of the State, and for the erection of State buildings, support of State institutions and perfecting public works," are as follows :

1. Has the Legislature power to declare what are " public works ? "

2. Are Railroads public works referred to by the Constitution ? and

3. Has the Legislature power under our Constitution to aid in the construction and completion of these public works ?

As to the first question : Has the Legislature power to de-
clare what are public works ?  If by this inquiry it is inten-
ded to ascertain whether in my opinion everything which
the Legislature might declare to be a public work is such,
or would become such within the meaning of the Constitu-
tion by the legislative declaration, I must answer it in the
negative.  Railroads or canals, or other works of internal
improvement and general utility, whether operated and
owned by the State or by a county, or an individual, are not
public works by reason of the christening received by means
of a legislative enactment, but because of their peculiar char-
acter, their uses and purposes and their general effect, all
combined.

To illustrate briefly : if the Legislature should declare my
house to be a " public work," the simple  declaration would
not make it such in law or in fact.  It would yet be my pri-
vate property, and the general public would have no greater
right to use or enjoy it without my consent than they had
before the enactment.  The issue of bonds by the State to aid
in building or perfecting my house, because of such legisla-
tive declaration, would not be warranted by the provision of
the Constitution referred to.

To the second question : Are Railroads " public works"
referred to by the Constitution ?  I answer, that according
to the common idea as to what a railroad is, they are public
works.  They are constructed, whether by the State or the
citizen, for the use and convenience of the public for purpo-
ses of travel, of facilitating commerce, and commercial and
social intercourse, of affording markets for all the produc-
tions of the country.  They enhance values, encourage and
promote immigration, increase the extent of productive agri-
culture, and are, like natural streams, public necessities ; the
highways upon which all may travel and transact business,
access to them being open to all the people on equal terms,
and can be denied to none.  But argument and illustration
are superfluous.  The legislative and judicial branches of

nearly all the States of the Union, as well as of the United States government, have so thoroughly settled the question upon principle, as well as upon public necessity, that it would be as idle and futile to attempt to reverse the current in that direction, as to stay the tides of the sea with a broom.

But the action of the several branches of the government of this State in reference to railroads and like enterprises, and in view of which action the terms of the Constitution were doubtless used, have given us an unmistakable guide in determining the meaning of such terms employed in it on this subject as seem to require interpretation.

To admit that railroads are public for one purpose and private for another purpose, solves the whole question involved. If they are public works in any sense, they are so within the terms of the Constitution.

In the exercise of the right of eminent domain, not only this State, but practically, all the States have used the power of subjecting private property to the public use and necessities, in obtaining the right of way for railroads in the process of construction, as for other roads created for the public use and convenience, upon the acknowledged principle that the rights of the individual must be in subordination to the interests of the whole community, saving only to the individual a compensation for the sacrifice involved.

I will not elaborate the proposition ; that has been amply done by Mr. Justice Westcott in his reply already forwarded.

Third. Has the Legislature power, under our Constitution, to aid in the construction and completion of these public works ? This, in the form presented, admits in my judgment neither an affirmative nor a negative answer. The language of the Constitution is special ; the term " perfecting" does not mean in its broad sense " constructing" public works. If the framers of that instrument had intended that the Legislature might have power to authorize an unlimited

47

bonded indebtedness for the general inauguration and construction of public works, they would not have used a term which merely includes the completing or finishing of works of public utility already authorized and incomplete. As is suggested by my brother Westcott, and as everybody knows who has examined the legislation of this State, and recognizes the existence of a system of internal improvements long since inaugurated by the people through the legislative branch of the State government, this system was in progress of development and completion at the time of the adoption of the Constitution. There was but one system or series of such public measures in progress, and none, I believe, under the exclusive control of the State.

My opinion is that the term "perfecting public works" refers strictly to the completion of such public works, including railroads, as were projected and in progress, or partially constructed at the time of the adoption of that phrase in the fundamental law of the State.

I have thus given, as briefly as possible, my opinion in reply to the questions propounded. Whether or not the recent legislation under this constitutional provision was wise, cannot affect the action of the courts. We have from these seats no right to question the wisdom of the Legislature as to the manner in which they have exercised or may exercise their discretion.

I have the honor to be,

Very respectfully,

E. M. RANDALL, C. J.